Filed 11/29/22 P. v. Mejia CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DANIEL MEJIA,<br><br>Defendant and Appellant. | F081568<br><br>(Super. Ct. No. BF171504A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County. Brian M. McNamara, Judge.

Derek K. Kowata, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Jeffrey A. White, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

On November 24, 2017, defendant Daniel Mejia, while driving under the influence of alcohol, collided into Juan R.'s[1] white Jeep causing the deaths of both Karla M. and A.M., along with significant injuries to Z.M. Defendant was convicted of numerous counts arising from the collision. He was sentenced to a determinate term of seven years, with a consecutive indeterminate term of 15 years to life.

On appeal, Mejia contends (1) the trial court prejudicially erred in admitting evidence of a prior car collision to establish knowledge pursuant to Evidence Code section 1101, subdivision (b); (2) this court should independently review the sealed *Pitchess*[2] material regarding Officer N. Petty to determine whether discovery was properly disclosed; and (3) this case should be remanded for resentencing in light of the passage of Assembly Bill No. 518 (Assembly Bill 518). The People concede Assembly Bill 518 applies retroactively to Mejia's case and therefore this matter should be remanded for resentencing.

We accept the People's concession, vacate the sentence, and remand for resentencing. In all other respects, we affirm the judgement.

## STATEMENT OF THE CASE

On March 2, 2020, a jury convicted Mejia of the second degree murder of Karla M. (Pen. Code,[3] § 187, subd. (a), count 1); the second degree murder of A.M. (§ 187, subd. (a), count 2); gross vehicular manslaughter of Karla M. (§ 191.5, subd. (a), count 3), with the special allegation that Mejia proximately caused the death and great bodily injury to more than one victim (Veh. Code, § 23558); gross vehicular

---

[1]    Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names or initials. No disrespect is intended.

[2]    *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

[3]    All other references are to the Penal Code, unless otherwise stated.

manslaughter of A.M. (§ 191.5, subd. (a), count 4), with the special allegation that Mejia caused death and great bodily injury to more than one victim (Veh. Code, § 23558); driving under the influence of alcohol causing bodily injury to Z.M. (Veh. Code, § 23153, subd. (a), count 5), with the special allegations Mejia caused death and great bodily injury to more than one victim (Veh. Code, § 23558), Mejia caused great bodily injury to both A.M. and Z.M. (§ 12022.7, subds. (a), (d)), and Mejia's blood alcohol content exceeded .15 percent (Veh. Code, § 23578); driving under the influence of alcohol with a .08 percent blood alcohol content causing bodily injury to Z.M. (Veh. Code, § 23153, subd. (b), count 6) with the special allegations Mejia proximately caused death to more than one victim (Veh. Code, § 23558), Mejia caused great bodily injury to both A.M. and Z.M. (§ 12022.7, subds. (a), (d)), and Mejia's blood alcohol content exceeded .15 percent (Veh. Code, § 23578).

Subsequently, the trial court sentenced Mejia as to count 1 to an indeterminate term of 15 years to life. As to count 2, the trial court sentenced Mejia to an indeterminate term of 15 years to life, to run concurrent with count 1. As to count 5, the trial court sentenced Mejia to the middle term of two years, plus an additional five years for the great bodily injury enhancement (§ 12022.7, subd. (d)), for a total of seven years to be served consecutive to count 1.[4] As to counts 3, 4, and 6, the trial court sentenced Mejia to multiple middle terms and imposed sentences for several enhancements and allegations, but stayed these sentences pursuant to section 654. The total term imposed was 15 years to life, plus seven years.

---

[4] The trial court stayed the other enhancements and allegations in count 5 pursuant to section 654.

3.

## STATEMENT OF FACTS

### I.    Prosecution Case-In-Chief

#### A.    Juan R.'s Testimony

During the afternoon of November 24, 2017, Juan drove a white Jeep Cherokee southbound on Highway 99 with his wife, Karla M., and his five-year old son, A.M. and three-year old daughter, Z.M.  During this time, Juan pulled over with a flat tire on the left side of the highway.  Juan turned on the Jeep's hazard lights and stepped out of the vehicle to repair the flat tire, while Karla, A.M., and Z.M. remained inside.  As Juan fixed the tire, a black Silverado truck hit the parked Jeep from behind causing it to catch fire. Juan ran over to the Jeep to try and help his family.

Subsequently, Karla and Z.M. were taken to the hospital.  Z.M. suffered a fractured hip and injuries to her left and right leg.  A.M. also suffered injuries, but died en route to the hospital.  Karla was transported to the hospital with internal injuries, and eventually died at the hospital.

#### B.    Percipient Witnesses[5]

Jaime R. drove southbound on Highway 99 when he observed a black truck[6] speeding close to 80 miles per hour, swerving in and out of two lanes, and driving in the dirt next to the road.  He noticed the truck's driver was a Hispanic male with short hair. Jaime eventually called 911.

Joshua M. drove southbound on Highway 99 when he observed a "truck that was cutting other cars off, driving on both lanes in the middle, and also swerving."  Joshua estimated the driver was traveling 100 miles per hour and he observed the truck almost collide with two or more other vehicles.  Hortencia S., Joshua's wife, was a passenger in

---

[5]    In their case-in-chief, the People introduced eight 911 calls made during or immediately after the collision.

[6]    Jaime testified the truck was either a Silverado or a Ram.

4.

the vehicle when she saw a black truck driving on the frontage road of the highway at a "very, very fast speed - - very alarming, fast speed." She called 911 and observed the truck for approximately one-minute.

Crystal B. drove southbound on Highway 99 when she observed a black truck pull in front of her and press its brakes causing her to almost hit the truck from behind. The driver then got out of the truck and Crystal's sister said, "Go. He's drunk." The driver "stumbled out of the truck" and "when he started walking towards [Crystal's] car [,] … he started leaning on the side of his truck to kind of hold on." At this point, Crystal called 911.

Emily H. was a passenger in a vehicle traveling southbound on Highway 99 when she heard her mom say there was a truck driving really fast from behind. She called 911 after observing the truck driving back and forth and "going super, super fast."

Tana C. drove southbound on Highway 99 when she observed a black pickup truck drive up behind her and almost hit her vehicle. She described the pickup's driving as "[v]ery reckless" and observed the truck "go[] from a lane all the way across, all the way back." Within two or three minutes, Tana saw a "cloud of smoke, and [they] came up on the accident." She observed the collision scene and observed a vehicle flipped over and on fire.

Jason S. drove northbound on Highway 99 when his wife spotted an accident on the southbound side of the highway. He ended up pulling over to render assistance and observed a white vehicle on its side. Jason noticed a female stuck inside the driver's area of the vehicle. Two men eventually pulled the female out of the vehicle. Additionally, six or seven other people attempted to help a "little girl" get out of the vehicle. Jason then found a boy and offered assistance by performing "mouth-to-mouth" on the child.

Rosa Z. was traveling southbound on Highway 99 when her vehicle was "almost driven off the road by a truck." The truck was going very fast and swerving between the

5.

lanes. Rosa called 911 because the driver "was driving so fast and so crazy … that [she] felt like he was going to hit somebody."

Sergeant J. Coleman testified he is employed with the Kern County Sheriff's Office. Sergeant Coleman was off duty traveling southbound on Highway 99 when he observed a white Jeep flip over on the center divider. He then observed a male subject chasing the Jeep. At this point, Sergeant Coleman got out of the car and attempted to help the passengers inside the Jeep. He and several other bystanders stabilized the Jeep to allow others to pull out the occupants of the Jeep. The woman and child were eventually pulled out of the Jeep.

Subsequently, Sergeant Coleman located a black Chevrolet or GMC truck further south on the highway and observed Mejia inside the truck. Sergeant Coleman contacted Mejia and noticed he had red, watery eyes and his breath smelled of an alcoholic beverage. Moreover, Sergeant Coleman noticed several beer bottles in the back of the truck and one or two beer bottles inside the truck's cabin.

### C.    Subsequent Emergency Response

Paramedic Jamie S. testified she was dispatched at approximately 4:16 p.m. to a traffic collision on Highway 99. Jamie arrived on scene and CPR was performed on a five-year-old boy, later identified as A.M. A.M. was declared dead at the scene of the collision due to a broken neck. Moreover, CPR was performed on an unconscious 23-year-old female, later identified as Karla. Lastly, she noticed a little girl, later identified as Z.M., who had an injury to her leg. Critical Care paramedic Jeffrey G. treated Z.M. and loaded her onto the ambulance. He noticed a laceration on Z.M.'s left foot and above her right eye. At this point, Z.M. was transported to the hospital. Z.M. suffered a thighbone fracture and a laceration to her left foot.

Jamie also called in a medical evacuation helicopter. Subsequently, part-time flight paramedic Nathan K. was dispatched to the intersection of Highway 99 and State Route 119 regarding a traffic collision. The helicopter flew over the scene and Nathan

noticed major damage to the white Jeep. Nathan unloaded Karla from the ambulance and loaded her onto the helicopter. Karla was transported via helicopter to the hospital and was subsequently treated by the hospital staff. However, Karla was pronounced dead at the hospital due to blunt injuries.

### D. Subsequent Law Enforcement Investigation

Officer M. Askins is employed as an officer with the California Highway Patrol (CHP). On November 24, 2017, he was monitoring radio traffic when a call came in regarding a black Chevrolet Silverado driving recklessly all over the road. He then observed a white Jeep on its side and on fire. Officer Askins noticed A.M. laying on the highway and proceeded to assist him. Eventually, the fire department and medical personnel arrived on scene to take over A.M.'s care. Officer Askins then looked inside Mejia's vehicle and observed empty and full beer bottles. During an inventory search, officers located three full and two empty beer bottles inside the truck's cab and a beer container and more beer bottles in the truck's bed.

CHP Officer C. Peyton subsequently arrived on scene to assist with a sketch diagram and measurements of the collision scene. The sketch showed Mejia's vehicle strike Juan's stationary vehicle, which was stopped within the center median. Mejia was traveling between 94 and 98 miles per hour and the accelerator was depressed all the way to the floor immediately before the collision.

Officer Askins then contacted CHP Officer N. Petty who had Mejia seated to the left of his truck on the ground. Officer Askins contacted Mejia and noticed slurred speech, red, watery eyes, and a distinct odor of an alcoholic beverage emitting from his breath. Mejia stated he was driving southbound on Highway 99 when he fell asleep. At this point, Officer Askins asked Mejia pre-sobriety test questions and Mejia admitted to drinking two beers before driving. Additionally, Officer Askins had Mejia perform field sobriety tests, which included the horizontal gaze nystagmus test. Officer Askins noticed a lack of smooth pursuit in each eye, which indicated intoxication. He did not have Mejia

7.

perform any other field sobriety tests because Mejia complained of leg pain. Officer Askins opined Mejia was unable to safely operate a vehicle due to his intoxication.

Officer Askins then placed Mejia under arrest and transported him to a hospital for a blood draw. He observed a nurse extract Mejia's blood at 6:53 p.m. Subsequently, forensic lab technician Mahlea A. analyzed the blood and determined the blood alcohol content was .251 percent. Criminalist D. Zimmerman testified an individual with a blood alcohol content of .251 percent is impaired and cannot safely operate a motor vehicle.

### E. Evidence of Mejia's Prior "Knowledge" Regarding the Dangers of Driving Under the Influence of Alcohol.

Department of Motor Vehicles Investigator Robert V. testified Mejia filled out a driver's license application, which contained certain advisements. The first advisement indicated Mejia "agree[d] to submit to a chemical test of [his] blood, breath, or urine for the purpose of determining the alcohol or drug content of [his] blood." The second advisement stated:

> "[B]eing under the influence of alcohol or drugs or both impairs the ability to safely operate a motor vehicle. Therefore, it is extremely dangerous to human life to drive while under the influence of alcohol or both. If [he] drive[s] while under the influence of alcohol or drugs or both, and as a result, a person is killed, [he] can be charged with murder."

L.B. testified she previously dated Mejia and was aware he drove a black Chevrolet truck. She told Mejia more than once "not to drink so much and not to - - like, not to drink and drive because it was … not safe." Mejia acknowledged to L.B. it was dangerous to drink and drive.

Veronica Q. testified that on February 6, 2017, she was asleep at home when she heard a loud crash outside. She ran outside and noticed a gray truck in the middle of her front yard. Veronica noticed her vehicle had been hit causing significant damage. She ended up calling the police. Officer R. Williamson with the Redlands Police Department arrived on scene and discovered the gray truck was registered to Mejia. On that same

8.

night, Officer Williamson contacted Mejia who was intoxicated. Mejia stated he was a passenger in the truck when it struck Veronica's vehicle.

## DISCUSSION

**I.       The February 6, 2017 Collision**

On appeal, Mejia contends the trial court erred in admitting evidence of the February 6, 2017 car collision where he was only a passenger in the vehicle because it was impermissible propensity evidence pursuant to Evidence Code section 1101, subdivision (b). In the alternative, Mejia argues section 352 required exclusion of evidence of the collision and that this evidence violated his constitutional rights to due process and a fair trial. We disagree.

**A.       Additional Factual Background**

The People during motions in limine moved to admit evidence of a prior collision that took place in Redlands on February 6, 2017. Specifically, the People moved to admit evidence Mejia's vehicle was involved in a hit and run collision and that he was intoxicated during his contact with law enforcement. The People asked to call Veronica and Officer Williamson to testify to this incident. The People argued the evidence was admissible to establish knowledge pursuant to Evidence Code section 1101, subdivision (b) because "[c]learly this incident showed [Mejia] how dangerous it is to drive while intoxicated … [and] [t]his incident illustrates [Mejia] personally was made aware that driving under the influence is dangerous whether he was the driver or not." Trial counsel objected stating:

> "The fact that [defendant] may have been involved in a hit-and-run, may have made a false statement wouldn't be evidence that he knows that drinking and driving is a dangerous offense. So I don't - - I don't understand that argument. I don't think that argument applies to this case. This case is distinguished where he allegedly hit a parked car and then left the scene and reported his vehicle stolen. That seems to be - - to me, that would be a confusing issue for the jury, wouldn't help them reach a

9.

decision as to his state of mind, whether or not he's guilty or innocent in this matter. I would request that it be excluded."

The trial court requested the parties provide additional cases on the issue, subsequently reviewed these cases, and concluded:

> "The Court did read these cases. It focused very much on the facts of these cases and applied it to the facts related to uncharged acts here. It's uncharged 'act' here. The Court rules as follows: The 1101 (b) motion requested by the prosecution lists one uncharged act where the defendant's car struck a parked BMW in a residential neighborhood. The defendant was intoxicated when contacted by police. The defendant was not charged in this case. The defendant did falsify a police report that the car was stolen. He later admitted that he was in the vehicle. The prosecution requests to use this evidence to prove intent and knowledge in this case. The relevance depends in part on whether the fact is sufficiently similar to the current charges to support a rational inference of intent and/or knowledge. The least degree of similarity between the uncharged act and the charged offense is required in order to prove intent. In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant probably harbored the same intent in each instance.

> "Given the fact, scenarios presented by the prosecution in their trial brief and information supplied in argument and the law stated above, the Court will only consider the prosecution's request under knowledge for 1101 (b) purposes. The fact that no case was filed against the defendant and the driver of the vehicle is undetermined, the Court did not find the uncharged act sufficiently similar to perceive as to intent. A second consideration is the probative value of the evidence of [defendant's] uncharged act against the potential for prejudice resulting from his improper use by the jury. The evidence to be presented is not particularly inflammatory and does not contain highly prejudicial details. Indeed, it does little more than show the occurrence of a previous accident. Therefore, probative value of this knowledge is high and outweighs the prejudicial effect. The Court finds the testimony involved in the uncharged act will not take up a substantial consumption of time given the length of the trial. Moreover, jury confusion is unlikely because the Court will provide a limiting instruction to the jury.

> "[¶] … [¶]

"Here, the probative value outweighs the substantial danger of undue prejudice. After weighing these factors, the Court will admit the evidence of the uncharged act. Here, the Court finds the facts of the uncharged act can impugn knowledge of the defendant as an occupant in a vehicle that driving a vehicle recklessly can cause injury or property damage."

Immediately after Veronica and Officer Williamson's testimony, the trial court instructed the jury as follows:

"Ladies and gentlemen, I'll take a moment to explain the context of that evidence you heard, just the last two witnesses. I'll read it to you.

"Evidence has been introduced for the purpose of showing that the defendant has been previously contacted by law enforcement while he was a passenger in his own car which caused vehicle damage to another vehicle. Such evidence, if believed, is not received and may not be considered by you to prove that the defendant is a person of bad character or that he has a disposition to commit crimes. Such evidence is received and may be considered by you only for the limited purpose of determining if it tends to show that the defendant's previous contact with police can impugn knowledge on the defendant as an occupant in a vehicle involved in an accident that driving a vehicle recklessly can cause injury or property damage. This is relevant as to whether or not the defendant acted with gross negligence in Counts 3 and 4. For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case. You are not permitted to consider such evidence for any other purpose. I'll instruct you further on this issue after evidence has concluded."

After the close of evidence, the trial court instructed the jury that "[d]uring the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other." (CALCRIM No. 303.) Moreover, the trial court instructed the jury with CALCRIM No. 375 as follows:

"The People presented evidence that the defendant has been previously contacted by law enforcement while he was a passenger in his own car which caused vehicle damage to another vehicle. You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, had been previously contacted by law enforcement while he was a passenger in his own vehicle which caused vehicle damage to another vehicle. Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable

11.

doubt. A fact is proved by a preponderance of the evidence if you conclude that it's more likely than not that the fact is true. If the People have not met this burden, you must disregard this evidence entirely. If you decide that the defendant was previously contacted by law enforcement while he was a passenger in his own vehicle which caused vehicle damage to another vehicle, but are not required to - - you may, but are not required to, consider that evidence for the limited purpose of deciding whether this incident can impugn knowledge on the defendant as an occupant in a vehicle involved in an accident, that driving a vehicle recklessly can cause injury or property damage. Do not consider this evidence for any other purpose. Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime.

"If you conclude that the defendant's previous contact with police can impugn knowledge on the defendant as an occupant in a vehicle involved in an accident that driving a vehicle recklessly can cause injury or property damage, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of Counts 3 and 4 and any lesser charges associated with these counts. The People must still prove each charge beyond a reasonable doubt."

## B.    Applicable Law

The general rule is "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a); see *People v. Ewoldt* (1994) 7 Cal.4th 380, 393.) However, under Evidence Code section 1101, subdivision (b), "evidence that a defendant has committed an offense … may be received to establish, among other things, identity, intent, motive, … plan," or knowledge. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1316.)

This court reviews questions concerning the admissibility of evidence for an abuse of discretion. (See *People v. Waidla* (2000) 22 Cal.4th 690, 717.) This includes a trial court's decision to admit "other crimes" evidence pursuant to section 1101, subdivision (b). (*People v. Scully* (2021) 11 Cal.5th 542, 587 ["We review the trial court's ruling on the admissibility of other crimes evidence for abuse of discretion"].) Our review

12.

examines "the evidence in the light most favorable to the trial court's ruling." (*People v. Edwards* (2013) 57 Cal.4th 658, 711.) We will not disturb the trial court's ruling absent a showing the court " ' "exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Morales* (2020) 10 Cal.5th 76, 97 (*Morales*), quoting *People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

In *People v. Watson* (1981) 30 Cal.3d 290, our Supreme Court held that murder charges may arise out of vehicle accidents where the evidence reveals implied malice when "a person, knowing that his conduct endangers the life of another, nonetheless acts deliberately with conscious disregard for life." (*Id.* at p. 296.) "[A] finding of implied malice depends upon a determination that the defendant actually appreciated the risk involved, i.e., a *subjective* standard." (*Id.* at pp. 296-297.)

However, unlike second degree murder, gross vehicular manslaughter while intoxicated is defined as "the unlawful killing of a human being without malice aforethought, in the driving of a vehicle, where the driving was in violation of Section 23140, 23152, or 23153 of the Vehicle Code, and the killing was either the proximate result of the commission of an unlawful act, not amounting to a felony, and with gross negligence, or the proximate result of the commission of a lawful act that might produce death, in an unlawful manner, and with gross negligence." (§ 191.5, subd. (a).) " '[G]ross negligence is the exercise of so slight a degree of care as to raise a presumption of conscious indifference to the consequences. [Citation.] The test is objective: whether a reasonable person in the defendant's position would have been aware of the risk involved.' " (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1204 (*Ochoa*).)

In *Ochoa*, the prosecutor sought to present evidence of the defendant's prior conviction for driving under the influence of alcohol, his resulting probation, and the fact he attended traffic school, including a class specifically addressing the dangers of drinking and driving. (*Ochoa*, *supra*, 6 Cal.4th at pp. 1204-1205.) The trial court

13.

admitted the evidence finding it was relevant to demonstrate the defendant was aware of the dangers of drinking and driving. (*Id*. at p. 1205.) The defendant argued that because the test for gross negligence is an objective one, based on an inquiry as to whether a reasonable person in the defendant's position would have been aware of the risks, evidence relevant to the defendant's subjective state of mind was both irrelevant and unduly prejudicial. (*Ibid*.) Our Supreme Court disagreed and stated, "[A]lthough the test for gross negligence [is] an objective one, '[t]he jury should therefore consider all relevant circumstances … *to determine if the defendant acted with a conscious disregard of the consequences rather than with mere inadvertence*. [Citations.]' [Citations.] [T]he evidence at issue here was relevant to defendant's awareness of the risk, and was admissible on that basis." (*Id*. at pp. 1205-1206, italics in original.) The trier of fact may conclude from a defendant's "course of conduct and preexisting knowledge of the risks that he exercised so slight a degree of care as to exhibit a conscious indifference or 'I don't care attitude' concerning the ultimate consequences of his actions. Applying the objective test for gross negligence, any reasonable person in [the] defendant's position would have been aware of the risks presented by his [or her] conduct. [Citation.] … '[T]he finding of gross negligence … may be based on the overall circumstances surrounding the fatality.' " (*Id*. at p. 1208, italics omitted.)

Moreover, in *People v. Ortiz* (2003) 109 Cal.App.4th 104 (*Ortiz*), a jury found the defendant guilty of second degree murder after several witnesses reported seeing the defendant driving in an aggressive and reckless manner immediately preceding the crash. (*Id*. at pp. 107-108.) The defendant was *not* intoxicated. (*Id*. at p. 108.) Nevertheless, the prosecution argued the evidence was admissible under Evidence Code section 1101, subdivision (b), to prove the defendant's knowledge of the dangers posed by reckless driving. (*Id*. at pp. 111-112.) On appeal, the defendant claimed the evidence was inadmissible under Evidence Code section 1101, subdivision (a). (*Id*. at p. 112.)

14.

The Court of Appeal concluded the trial court did not abuse its discretion in admitting the evidence because "courts have recognized repeatedly that a motor vehicle driver's previous encounters with the consequences of recklessness on the highway … sensitizes him to the dangerousness of such life-threatening conduct." (*Ortiz*, *supra*, 109 Cal.App.4th at p. 112.) Moreover, the court stated for the "purposes underlying the admissibility issue under section 1101(b), it does not matter whether alcohol or other inebriates are involved in the uncharged misconduct or *whether it is caused by something else.*" (*Id.* at p. 116, italics added.)

### C.     Analysis

#### i.     The Trial Court Did Not Abuse Its Discretion

Here, the trial court admitted evidence of the February 6, 2017 car collision because "the facts of the uncharged act can impugn knowledge of the defendant as an occupant in a vehicle that driving a vehicle recklessly can cause injury or property damage." Therefore, the trial court concluded this evidence was admissible to establish knowledge pursuant to Evidence Code section 1101, subdivision (b).

The trial court did not abuse its discretion in admitting evidence of the February 6, 2017 collision. Mejia's presence in his registered vehicle during the collision, even as a passenger, established his "preexisting knowledge of the risks that he exercised so slight a degree of care as to exhibit a conscious indifference or 'I don't care attitude' concerning the ultimate consequences of his actions." (*Ochoa*, *supra*, 6 Cal.4th at p. 1208.) Moreover, the trial court could have concluded the prior collision " 'increase[d] [his] subjective awareness of the perils of driving badly' " and the court had " 'to find out what he was exposed to that most people aren't exposed to in order to understand his level of awareness of the dangers of driving badly.' " (*Ortiz*, *supra*, 109 Cal.App.4th at p. 116.) As the trial court stated on the record, "[T]he uncharged act can impugn knowledge of the defendant as an occupant in a vehicle that driving a vehicle recklessly can cause injury or property damage." This prior knowledge of reckless driving would

15.

support a finding Mejia acted grossly negligent for the crimes of gross vehicular manslaughter, as alleged in counts 3 and 4. Accordingly, we conclude the trial court did not abuse its discretion by allowing the prior car collision into evidence for purposes of establishing prior knowledge pursuant to Evidence Code section 1101, subdivision (b). (See *People v. Scully*, *supra*, 11 Cal.5th at p. 587.)

Nonetheless, Mejia argues the trial court erred in admitting evidence regarding the collision because "[i]n the prior incident, [Mejia] was merely an intoxicated passenger in a car that hit a parked vehicle, and there was no evidence presented that [Mejia] had been the driver of that vehicle, or that the driver had been driving recklessly, or that [Mejia] had any knowledge that the driver had been driving recklessly." The collision evidence was still relevant even though Mejia was not the driver. Veronica testified she was asleep at home when she heard a loud crash outside and subsequently noticed a gray truck, registered to Mejia, in the middle of her lawn in the front yard. Although there was no evidence regarding the vehicle's driving pattern or its speed, it was reasonable to infer the vehicle was traveling at a high rate of speed based on it crashing into the front yard of a residence, along with the fact Veronica heard a loud crash outside her house late at night. Therefore, as noted above, Mejia's presence even as a passenger "increase[d] [his] subjective awareness of the perils of driving badly and speeding." (*Ortiz*, *supra*, 109 Cal.App.4th at p. 116, italics omitted.) Accordingly, we conclude the trial court did not abuse its discretion in admitting evidence of the prior collision pursuant to Evidence Code section 1101, subdivision (b). The record indicates the trial court considered this 2017 collision evidence for that limited purpose and thus, the trial court's ruling was not arbitrary, and Mejia points to nothing in the record to suggest manifest injustice arose from its decision. (*Morales*, *supra*, 10 Cal.5th at p. 97.)

### ii. Evidence Code Section 352

Mejia further contends the collision evidence should be excluded pursuant to Evidence Code section 352 because "[t]he prejudicial effect of prior 'bad acts' evidence clearly outweighed its probative value."

"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) " '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and *which has very little effect on the issues*. In applying section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638, italics added.)

Here, *Ortiz* is again instructive. The *Ortiz* court noted minimal potential for prejudice existed because evidence of the prior acts were " 'no stronger and no more inflammatory than the testimony concerning the charged offenses.' " (*Ortiz, supra*, 109 Cal.App.4th at p. 118.) Moreover, the court concluded the trial court properly conducted an Evidence Code section 352 analysis because it "neither granted nor rejected admission of the proffered evidence in toto," but "[i]nstead, [the trial court] ruled some of the People's evidence admissible and some inadmissible." (*Id*. at p. 117.) Finally, the trial court instructed the jury it could only consider evidence of prior misconduct for the limited purpose of evaluating the defendant's intent. (*Id*. at p. 118.)

The trial court in this case conducted a 352 analysis and admitted the evidence because "[t]he evidence to be presented is not particularly inflammatory and does not contain highly prejudicial details" and "it does little more than show the occurrence of a previous accident." The risk of prejudice was low because the facts of this case involved

17.

a DUI crash with two fatalities and serious injuries, whereas the prior 2017 collision involved only property damage. (See *Ortiz*, *supra*, 109 Cal.App.4th at p. 118.) Additionally, the trial court "neither granted nor rejected admission of the proffered evidence in toto" because it admitted the evidence for purposes of establishing knowledge, but excluded the evidence to prove intent. (*Id*. at p. 117.) Lastly, the trial court instructed the jury, both before Veronica's and Officer Williamson's testimony and after the presentation of evidence, the testimony was offered for the limited purpose of deciding whether this collision can impugn knowledge on Mejia that driving a vehicle recklessly can cause injury or property damage. (*Id*. at p. 118.) Therefore, the trial court did not abuse its discretion because it properly conducted an Evidence Code section 352 analysis.

### iii. No Due Process Violation Occurred and Any Alleged Error was Harmless.

Mejia further contends the admission of the prior 2017 collision violated his rights to due process and a fair trial and prejudiced this case.[7] We conclude Mejia's constitutional rights were not violated. However, even if we concluded the trial court erred in admitting evidence of the prior collision, any error was harmless.

" 'The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair.' " (*People v. Jablonski* (2006) 37 Cal.4th 774, 805; see *People v. Partida*, *supra*, 37 Cal.4th at p. 439 [the defendant's right to due process was not violated when the trial court

---

[7] Mejia argues the alleged error triggers review under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). He claims it violated his federal constitutional rights to due process and to a fair trial. *Chapman* review does not apply here because the error complained of concerns the application of state evidentiary law, and Mejia fails to show admission of the car collision rendered his trial fundamentally unfair. (*People v. Partida* (2005) 37 Cal.4th 428, 439 ["Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional [*People v.*] *Watson* [(1956) 46 Cal.2d 818, 836] test"].)

admitted gang evidence over an Evid. Code, § 352 objection]; *People v. Westerfield* (2019) 6 Cal.5th 632, 700 [purported error in allowing evidence prohibited by Evid. Code, § 1101, subd. (a) did not result in a due process violation].)

Here, we fail to see how the admission of the 2017 collision rendered Mejia's trial fundamentally unfair. By the time the evidence was introduced, the jury heard multiple 911 calls related to the underlying collision, testimony regarding defendant's reckless driving, his high blood-alcohol content of .251 percent, and evidence of the collision scene. In relation to the underlying case, the 2017 collision evidence was comparatively innocuous. Moreover, as noted above, the jury was twice instructed it could only consider this evidence for the limited purpose of establishing knowledge. Therefore, no due process violation occurred.

However, even if we concluded the trial court erred in admitting this evidence, Mejia has failed to establish he was prejudiced. (*Watson*, *supra*, 46 Cal.2d at p. 837.) The standard requires the defendant to establish "that it is ' "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' " (*People v. Gonzalez* (2018) 5 Cal.5th 186, 195, quoting *Watson*, *supra*, at p. 837.)

Specifically, Mejia argues this evidence was prejudicial because "despite the [trial] court's instruction that the prior incident only applied to counts 3 and 4, it would have been impossible or unlikely that the jury was able [to] ignore that evidence in determining whether [Mejia] acted with implied malice in counts 1 and 2." We disagree. First, "[w]e presume that jurors understand and follow the court's instructions." (*People v. Pearson* (2013) 56 Cal.4th 393, 414.) Therefore, unless evidence says otherwise, we presume the jury did not use the uncharged acts evidence in relation to the murder charges. Second, even assuming the jury impermissibly used the evidence, it is not reasonably probable Mejia would have received a more favorable verdict. Evidence in support of the murder charges (counts 1 and 2) was overwhelming.

19.

The jury heard testimony from multiple witnesses and listened to several 911 calls regarding Mejia's erratic driving and that he drove between 94 and 98 miles per hour immediately prior to the collision. Further, the jury heard testimony the accelerator was depressed all the way to the floor and that the pedal's position was "[m]ost likely not" done by accident. The jury also heard evidence Mejia had a blood alcohol content of .251 percent, more than three times the legal limit. Lastly, the jury heard evidence Mejia was advised when he obtained his license that "being under the influence of alcohol … is extremely dangerous to human life … and as result, [if] a person is killed, [he] can be charged with murder" and also acknowledged drinking and driving was unsafe to his girlfriend, L.B. Accordingly, the evidence of implied malice was so overwhelming that even if the jury did not hear evidence of the 2017 collision, it was not reasonably probable he would have received a more favorable verdict and thus any error in admitting the evidence was harmless.

## II.    The *Pitchess* Motion

Mejia further asks this court to conduct a review of the files reviewed by the trial court to determine (1) whether there were any additional discoverable records that should have been disclosed and (2) whether the trial court followed the correct procedures in the *in camera* proceedings.

### A.    Additional Factual Background

Prior to the trial, trial counsel filed a *Pitchess* motion seeking all of Officer Petty's personnel records. Without providing specific details, the motion alleged Officer Petty had engaged in excessive force and filed false police reports. In part, the motion cited *Brady*[8] as grounds for disclosure of Officer Petty's personnel records.

Mejia stated in his declaration that he received a letter from the Kern County District Attorney's Office that Officer Petty was "on administrative leave" as of

---

[8]    *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*)

20.

September 20, 2019. Trial counsel stated in his declaration that Officer Petty "in the above captioned matter may have falsified information in the ensuing police [investigation] after the incident."

In November 2019, the trial court heard Mejia's *Pitchess* motion regarding Officer Petty's personnel file. The trial court "grant[ed] the motion to do an in camera review on CHP Officer Petty for dishonesty … because the D.A. told the defense they should do a Pitchess motion … [and] once the D.A. tells the defense to do it, I need to do it." After conducting an in camera review, the trial court granted the *Pitchess* motion and subsequently ordered two witness names and contact information to be released to trial counsel.

### B. Applicable Law

In some circumstances, a criminal defendant may gain access to a law enforcement officer's personnel file. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1219.) In a *Pitchess* motion, a defendant must describe the type of records or information sought, and include affidavits showing good cause for the discovery or disclosure sought. (*Mooc*, *supra*, at p. 1226.) The defendant must set forth the materiality of the requested information to the subject matter involved in the pending litigation and the affidavits may be based on information and belief, and need not be based on personal knowledge. (*Ibid*.) However, the information sought must be requested "with sufficient specificity" to preclude a possibility a defendant is "simply casting about for any helpful information." (*Ibid*.) A defendant must demonstrate a logical link between any proposed defense and the pending charge, and describe with some specificity how the sought discovery would impeach the officer's version of events or support such a defense. (*People v. Superior Court (Johnson)* (2015) 61 Cal.4th 696, 720.)

An abuse of discretion standard is used to review a trial court's decision regarding a motion for discovery of peace officer personnel records. (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1039, overruled on other grounds in *Facebook, Inc. v. Superior*

*Court (Touchstone)* (2020) 10 Cal.5th 329, 345-346, fn. 6.) We will not disturb the trial court's ruling absent a showing the court " ' "exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Morales*, *supra*, 10 Cal.5th at p. 97, quoting *People v. Rodriguez*, *supra*, 20 Cal.4th at pp. 9-10.)

### C.      Analysis

Based on our independent review of the sealed record, which includes the trial court hearing transcript of the in camera *Pitchess* hearing on November 12, 2019, we conclude the trial court properly considered whether any of the personnel records of Officer Petty were discoverable. The records were adequately described and discussed on the record, and the trial court ordered contact information to be released to trial counsel as a result of the hearing. We conclude, as did the trial court and custodian of records, there were no physical records constituting relevant discoverable *Pitchess* material. Accordingly, we conclude the trial court did not abuse its discretion in declining to release confidential records of Officer Petty, but rather chose to only release the names and contact information of two witnesses to trial counsel.

However, even if the trial court erred, Mejia was not prejudiced by this error. The proper standard of analysis to be applied in determining whether Mejia was prejudiced from the denial of *Pitchess* discovery is whether "there was a reasonable probability that the outcome of the case would have been different had the information been disclosed to the defense." (*People v. Hustead* (1999) 74 Cal.App.4th 410, 422.) Officer Petty did not testify at the trial and was minimally involved in the underlying DUI investigation because he was only responsible for transporting Mejia to the hospital. Accordingly, even if the trial court erred in both failing to follow proper procedures and releasing certain information, any error was harmless.

22.

### III. Assembly Bill No. 518

In supplemental briefing, Mejia contends he is entitled to resentencing under newly passed Assembly Bill 518, which amended section 654. The People concede Mejia is entitled to the benefit of Assembly Bill 518 and that remand is required. We therefore agree Mejia is entitled to the retroactive benefits of Assembly Bill 518.

#### A. Applicable Law

Assembly Bill 518 amended section 654, subdivision (a), to provide: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (Stats. 2021, ch. 441, § 1, eff. Jan. 1, 2022.) Previously, "the sentencing court was required to impose the sentence that 'provides for the longest potential term of imprisonment' and stay execution of the other term. [Citation.] … [S]ection 654 now provides the trial court with discretion to impose and execute the sentence of either term, which could result in the trial court imposing and executing the shorter sentence rather than the longer sentence." (*People v. Mani* (2022) 74 Cal.App.5th 343, 379.)

Under the rule of *In re Estrada* (1965) 63 Cal.2d 740, " '[w]hen the Legislature has amended a statute to reduce the punishment for a particular criminal offense, we will assume, absent evidence to the contrary, that the Legislature intended the amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date.' " (*People v. Winn* (2020) 44 Cal.App.5th 859, 872.)

#### B. Analysis

Here, the trial court sentenced Mejia as to count 1 to an indeterminate term of 15 years to life. As to count 5, the trial court sentenced Mejia to the middle term of two years, plus five years for the great bodily injury enhancement (§ 12022.7, subd. (d)) to be served consecutive to count 1. As to counts 3, 4, and 6, the trial court sentenced Mejia to multiple terms, but stayed these sentences pursuant to section 654.

Mejia's judgment is not yet final because his appeal is presently before us. (See *People v. Jennings* (2019) 42 Cal.App.5th 664, 682 ["For purposes of the *Estrada* rule, a judgment is not final so long as courts may provide a remedy on direct review."].) Moreover, nothing in Assembly Bill 518 suggests legislative intent the amendments apply prospectively only. Therefore, Mejia is entitled to the benefit of Assembly Bill 518. (*People v. Sek* (2022) 74 Cal.App.5th 657, 673 ["Assembly Bill 518 … applies retroactively to defendants … whose convictions were not yet final when the law became effective January 1, 2022."].)

## DISPOSITION

Mejia's sentence is vacated and this matter is remanded for resentencing. In all other respects, the judgment is affirmed.

SMITH, J.

WE CONCUR:

LEVY, Acting P. J.

SNAUFFER, J.